112 F.3d 682
 65 USLW 2717, 9 NDLR P 343
 Elizabeth J. Arnold LAKE, Justin Wilson Lake, husband and
wife, Appellants,
v.
Frederick S. ARNOLD, Audrey L. Arnold, husband and wife,
Daniel M. Friday, M.D., Tyrone Hospital, Ralph W.
Crawford, M.D.
 No. 96-3412.
 United States Court of Appeals,
Third Circuit.
 Argued March 10, 1997.
Decided May 2, 1997.
As Amended May 15, 1997.
 
 Kristin M. Banasick (argued), Bedford, PA, for appellants.
 Stephen D. Wicks, Altoona, PA, for appellees Frederick S. Arnold And Audrey L. Arnold.
 David R. Bahl (argued) McCormick, Reeder, Nichols, Bahl, Knecht & Person, Williamsport, PA, for appellees Daniel M. Friday, M.D. and Ralph W. Crawford, M.D.
 John V. DeMarco (argued) Sherry, McCrory & Doyle, Pittsburgh, PA, for appellee Tyrone Hospital.
 Before: MANSMANN and LEWIS, Circuit Judges and DUPLANTIER, District Judge.*
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 This appeal from the dismissal of civil rights claims pursuant to Fed.R.Civ.P. 12(b)(6) presents a question of first impression for us: whether a plaintiff's status as a mentally retarded female[1] places her within a cognizable class entitled to protection under 42 U.S.C. § 1985(3). We must also determine whether the plaintiffs' allegations of state action for purposes of 42 U.S.C. § 1983 are sufficient to withstand the defendants' motions to dismiss for failure to state a claim. Because we are convinced that the plaintiffs have succeeded in stating a cause of action under both 42 U.S.C. § 1985(3) and 42 U.S.C. § 1983, we will reverse the order of the district court.
 
 I.
 
 2
 On May 31, 1995, Elizabeth Arnold Lake and her husband, Justin Lake, filed suit in a Pennsylvania state court alleging, in addition to several state law claims, the deprivation of civil rights under 42 U.S.C. §§ 1985(3) and 1983. Named as defendants were Elizabeth Lake's parents, Tyrone Hospital, and two of the hospital staff physicians. The plaintiffs allege generally that in June, 1977, sixteen-year-old Elizabeth Lake was taken to Tyrone Hospital by her parents where she underwent a tubal ligation. Elizabeth states that she was unable to give informed consent to the operation because she was illiterate and retarded. The plaintiffs allege that they were not made aware of the nature of the surgery which had been performed until Elizabeth underwent a medical examination in December, 1993.
 
 
 3
 Tyrone Hospital removed the action to the United States District Court for the Western District of Pennsylvania, and all defendants filed motions to dismiss the federal claims pursuant to Fed.R.Civ.P. 12(b)(6). Following amendment of the complaint, the magistrate judge issued a Report and Recommendation, advising that the section 1985(3) and 1983 claims be dismissed and that the remaining claims be remanded to the state court. The section 1985(3) claim was deemed deficient based on the magistrate judge's conclusion that "handicapped persons were neither intended to be a class nor reasonably [can] be considered to be a class for purpose of section 1985(3)." The magistrate judge found that the section 1983 claim failed adequately to allege state action on the part of Tyrone Hospital or the defendant doctors. Following de novo review, the district court adopted the report and recommendation of the magistrate judge dismissing the federal claims and remanding the remaining claims to state court. This timely appeal followed.
 
 II.
 A.
 
 4
 We exercise plenary review of the district court's order dismissing the plaintiffs' federal claims pursuant to Fed.R.Civ.P. 12(b)(6). Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.1993). In reviewing the order we must accept as true each of the factual allegations set forth in the complaint, D.R. v. Middle Bucks Area Voc. Tech. School, 972 F.2d 1364, 1367 (3d Cir.1992). We are particularly vigilant in reviewing orders dismissing claims alleging civil rights violations; we will "not affirm a dismissal at the pleading stage, unless it is readily discerned that the facts cannot support entitlement to relief." Carter v. City of Philadelphia, 989 F.2d 117, 118 (3d Cir.1993). With this liberal standard in mind, we turn to the plaintiffs' claim that the defendants conspired to deprive her of the "fundamental right to procreation" in violation of section 1985(3).[2]
 
 B.
 
 5
 The requirements for establishing a cause of action under 42 U.S.C. § 1985(3) are set forth in a line of Supreme Court cases beginning with the decision in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). There, the Supreme Court clarified that the reach of section 1985(3) is limited to private conspiracies predicated on "racial, or perhaps otherwise class based, invidiously discriminatory animus." Id. at 102, 91 S.Ct. at 1798. The Court strictly construed the requirement of class-based invidious animus in United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), finding that commercial and economic animus could not form the basis for a section 1985(3) claim. Read together, these two cases establish that in order to state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. Id. at 828-29, 103 S.Ct. at 3356; Griffin v. Breckenridge, 403 U.S. at 102-03, 91 S.Ct. at 1798-99. The vitality of this analysis was reaffirmed in Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268, 113 S.Ct. 753, 758-59, 122 L.Ed.2d 34 (1993).
 
 
 6
 The district court dismissed the plaintiffs' claim under section 1985(3) based solely upon its conclusion that Elizabeth Lake's membership in the class of handicapped individuals did not entitle her to the protection afforded by section 1985(3). The issue posed by this dismissal requires us to confront an issue which we have recognized but have not been compelled to address until now: whether the scope of 42 U.S.C. § 1985(3) is sufficiently broad to protect the mentally retarded as a class.[3]
 
 
 7
 There are no precise parameters defining the boundaries of "class" within the meaning of section 1985(3). "The best that can be said of § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in flux by the Supreme Court." Trautz v. Weisman, 819 F.Supp. 282, 291 (S.D.N.Y.1993).[4] In both Griffin and Scott the Supreme Court left open the possibility that section 1985(3) might apply to class-based animus not based upon race. In Bray, the sole Supreme Court case to address what might constitute an "otherwise class-based invidiously discriminatory animus," the Court clarified only that a class for purposes of section 1985(3) must be "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." 506 U.S. at 269, 113 S.Ct. at 759.
 
 
 8
 The lack of definitional standards applicable to the identification of classes protected by section 1985(3) has resulted in a split of authority with respect to the question now before us. The courts of appeals which have considered whether the handicapped as a class are entitled to the protection of section 1985(3) are divided. The Court of Appeals for the Seventh Circuit in D'Amato v. Wisconsin Gas Co., 760 F.2d 1474 (7th Cir.1985) and the Court of Appeals for the Tenth Circuit in Wilhelm v. Continental Title Co., 720 F.2d 1173 (10th Cir.1983) have held that handicapped individuals do not fall within the purview of section 1985(3). The opposite conclusion was reached by the Court of Appeals for the Second Circuit in People by Abrams v. 11 Cornwell Co., 695 F.2d 34 (2d Cir.1982), vacated in part on other grounds, 718 F.2d 22 (2d Cir.1983). Our own jurisprudence, informed by the reasoning of our sister court, convinces us that the mentally retarded, as a class, are entitled to the protection afforded by section 1985(3).[5]
 
 C.
 
 9
 We gave extended consideration to the history and scope of section 1985(3) in Novotny v. Great American Federal Savings and Loan Association, 584 F.2d 1235 (3d Cir.1978).[6] In the course of holding that women as a class are protected by section 1985(3), we wrote that, "[i]n determining the applicability of § 1985(3) ... [the] initial inquiry must be whether the actions which form the basis for [the] case are the offspring of a 'class-based invidiously discriminatory animus' within the meaning of the Griffin test." Id. at 1241.
 
 
 10
 While we recognized that "the statute now codified as 42 U.S.C. § 1985(3) [was enacted] as a part of section 2 of the Act of April 20, 1871 (the Klu Klux Klan Act)" and that the "Act was one of several Congressional reactions to the continued violent resistance to Reconstruction in the South," we declined to limit the reach of the Act to its historical context. Id. at 1238-39.[7] Rejecting the argument that section 1985(3) as originally enacted could not have contemplated punishing conspiracies against women, we referred to the expansive language of the section:
 
 
 11
 Section 2 of the Act was cast in general terms; it proscribed conspiracies aimed at depriving "any person or class of persons" of equal protection and equal privileges. The breadth of such language was not adventitious. While the impetus toward enactment of the lineal ancestor of section 1985(3) was supplied by concern regarding violence directed at blacks and Union sympathizers, the bill subsequently enacted contained no such limitation.
 
 
 12
 Id. at 1241. Our holding which declined to "truncat[e][the] sweep" of section 1985(3) is buttressed by the fact that "comparable Reconstruction civil rights legislation such as the equal protection clause of the fourteenth amendment has no such boundaries." Trautz v. Weisman, 819 F.Supp. at 294.[8]
 
 
 13
 We remain convinced that the scope of section 1985(3) is not fixed as of any given point in time, but must be subject to reinterpretation as times and circumstances require:
 
 
 14
 Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection.
 
 
 15
 584 F.2d at 1243. We are committed to the view that "equality ... is a frail, tenuous and changing notion, which does not sit still ... [but] moves in unpredictable waves with the shifting tides of history." Ken Gormley, Private Conspiracies and the Constitution: A Modern Version of 42 U.S.C. Section 1985(3), 64 Tex. L.Rev. 527, 550 (1985). "To ensure that private conspirators do not strip other citizens of the equal protection of the laws, we must be particularly concerned with those discrete and insular minorities who have traditionally borne the brunt of prejudice in our society." Id. at 575.
 
 
 16
 In Novotny, we relied on Congress' characterization of classifications based on gender as inherently invidious and upon the immutable nature of gender to conclude that women, as a class, were entitled to the protection of section 1985(3):
 
 
 17
 [S]ex, like race and national origin, is an immutable characteristic determined by the accident of birth ... and the sex characteristic frequently bears no relation to ability to perform or contribute to society. Thus, to deprive members of a class founded on gender of equal protection or equal privileges and immunities without any justification is to act in an irrational and odious manner hence, with an invidiously discriminatory animus.
 
 
 18
 584 F.2d at 1243.
 
 
 19
 When the language and intent of section 1985(3) are examined in light of the relatively recent recognition of current and historic prejudice directed toward the handicapped,[9] it is clear that much of our discussion of gender discrimination in Novotny applies with equal force. Discrimination based on handicap, including mental handicap, like that based on gender, often rests on immutable characteristics which have no relationship to ability. Where this is the case, we are convinced that the discrimination is invidious and that the reach of section 1985(3) is sufficiently elastic that the scope of its protection may be extended. In reaching this conclusion we are influenced by a number of factors which lie outside our own conjecture or analysis. We begin with the explicit statement of Congress itself. In enacting the Americans With Disabilities Act, Congress found that:
 
 
 20
 [I]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.
 
 
 21
 42 U.S.C. § 12101(a)(7).[10] Increasingly, legislators and courts have recognized that:
 
 
 22
 The history of discrimination against individuals with disabilities, while less noted than racial or sex discrimination, is no less a story of a group that has traditionally suffered not only physical barriers but the badge of inferiority emplaced by a society that often shuns their presence.
 
 
 23
 Trautz, 819 F.Supp. at 294-95.[11] We note, too, the analyses of those commentators which point out that the discrimination documented against the handicapped in general has been directed particularly at the mentally retarded in the context of involuntary sterilization. See generally Cepko, Involuntary Sterilization of Mentally Disabled Women, 8 Berkeley Women's L.J. 22 (1993); Estacio, Sterilization of the Mentally Disabled in Pennsylvania: Three Generations Without Legislative Guidance Are Enough, 92 Dick. L.Rev. 409 (1988); and Scott, Sterilization of Mentally Retarded Persons: Reproductive Rights and Family Privacy, 1986 Duke L. J. 806.
 
 
 24
 Having established in Novotny that the reach of section 1985(3) is not fixed at any given point in time, we cannot conclude, in light of these statements by Congress and research compiled by academicians, that the mentally retarded are excluded from section 1985(3) protection. We borrow from Novotny to frame our holding here: "The fact that a person bears no responsibility for [a handicap], combined with the pervasive discrimination practiced against [the mentally retarded] and the emerging rejection of [this discrimination] as incompatible with our ideals of equality convince[s] us that whatever the outer boundaries of the concept, an animus directed against [the mentally retarded] includes the elements of a 'class-based invidiously discriminatory' motivation." Novotny, 584 F.2d at 1243. The plaintiffs have succeeded in stating a cause of action pursuant to 42 U.S.C.1985(3).
 
 III.
 
 25
 Our analysis of the section 1983 claim is less complex. In reviewing the district court's grant of the defendants' 12(b)(6) motions to dismiss, we reiterate that we must accept as true all well-pleaded allegations in the complaint. With respect to this claim in particular it is important to note that:
 
 
 26
 The issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.
 
 
 27
 Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).
 
 
 28
 In order to state a claim under section 1983, a plaintiff must allege both a deprivation of a federally protected right and that this deprivation was committed by one acting under color of state law. The district court focused on the second requirement. While the court recognized that Elizabeth Lake alleged a non-consensual sterilization in violation of the federal constitutional rights, it concluded that the defendants did not act under color of state law. This conclusion was premature.
 
 
 29
 In an effort to establish state action, the plaintiffs alleged in their amended complaint that Tyrone Hospital: 1) was organized and exists under the laws of the Commonwealth; 2) is licensed by the appropriate Commonwealth agencies; 3) receives at least 50 per cent of its funding from federal sources and is accorded favorable federal, state, and local tax treatment; 4) is built on land conveyed by the Borough of Tyrone; 5) shares with or disburses profits to the Borough of Tyrone; 6) at relevant times "routinely" accepted SSI payments for sterilization of mentally retarded individuals; 7) was, in 1977, governed by a Board elected by the City of Tyrone or appointed by a governmental body or representative of the City; and 8) at relevant times operated under a policy of its Board by which the Board condoned and advanced the sterilization of Elizabeth Arnold and others similarly situated. If, as we must, we accept each of these allegations as true, we cannot say that the plaintiffs have failed to allege that defendants were state actors sufficient to withstand a motion to dismiss.
 
 
 30
 Although the parties cite a plethora of caselaw regarding standards to be applied in evaluating the presence or absence of state action, the undeveloped record makes application of that caselaw difficult. While ultimately it will be necessary to navigate "the legal morass of the ever evolving state action doctrine," Eaton v. Grubbs, 329 F.2d 710 (4th Cir.1964), we decline to do so at this early stage in the proceedings. Few, if any, of the relevant cases arose in the context of a motion to dismiss, and none, so far as we have been able to determine, was decided on the basis of a comparably incomplete factual record. Analysis of the law must attend development of the facts. For the purpose of surviving the defendants' motion to dismiss, the plaintiffs' section 1983 claim is sufficient.
 
 IV.
 
 31
 Because we are convinced that the plaintiffs have succeeded in stating a cause of action for deprivation of civil rights under both 42 U.S.C. § 1985(3) and 42 U.S.C. § 1983, we will reverse the order of the district court.
 
 
 
 *
 Honorable Adrian G. Duplantier of the United States District Court for the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 Throughout these proceedings Elizabeth Lake has described herself as mentally retarded. While we recognize that others may prefer different terminology and that Congress, in the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. refers to those with a "mental impairment," we have elected, for purposes of this opinion, to refer to Mrs. Arnold as she refers to herself
 
 
 [2]
 42 U.S.C. § 1985(3) provides as follows:
 If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 [3]
 See W.B. v. Matula, 67 F.3d 484, 503 n. 15 (3d Cir.1995)
 
 
 [4]
 Difficulties associated with the failure to define the classes entitled to protection under section 1985(3) have been the subject of academic discussion. See Ken Gormley, Private Conspiracies and the Constitution: A Modern Version of 42 U.S.C. Section 1985(3), 64 Tex. L.Rev. 527, 550 (1985); Helyn S. Goldstein, Note, Private Conspiracies to Violate Civil Rights: The Scope of 1985(3) After Great American Federal Savings & Loan Association v. Novotny, 61 B.U.L.Rev. 1007, 1008 (1981); Georgia M. Sullivan, Note, Protection of Constitutional Guarantees Under 42 U.S.C. Section 1985(3): Operation Rescue's "Summer of Mercy", 49 Wash. & Lee L. Rev. 237, 244 (1992)
 
 
 [5]
 Because the facts of this case do not require us to do so, we decline to define the class protected more broadly to include a wider range of handicaps or the handicapped in general. Although we can envision other cases which might fall within the analysis which we set forth here, we need not address them here
 
 
 [6]
 While our holding in Novotny that Title VII can be the source of a right asserted in an action brought pursuant to section 1985(3) was vacated by the Supreme Court in Great American Savings & Loan Association v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), our analysis of the history of section1985(3) and our discussion of the classes to which it extends were unaffected
 
 
 [7]
 In declining to "freeze" section 1985(3) in its historical context, we implicitly rejected the reasoning of our sister courts which have held that section 1985(3) does not apply to the handicapped as a class. In Wilhelm v. Continental Title Co., 720 F.2d 1173, 1176 (10th Cir.1983), the court found "nothing ... to give any encouragement whatever to extend § 1985 to classes other than those involved in the strife in the South in 1871 ...." In D'Amato v. Wisconsin Gas Company, 760 F.2d 1474, 1486 (7th Cir.1985), the court adopted a similarly restrictive reading of the statute: "The handicapped as a class differ radically from the racially based animus motivating the Ku Klux Klan and white supremacists against which Congress directed Section 1985(3)."
 
 
 [8]
 Other courts faced with deciding the scope of section 1985(3) have also looked to the broad interpretation accorded other Reconstruction enactments. See Tyus v. Ohio Department of Youth Services, 606 F.Supp. 239, 246 (S.D.Oh.1985):
 Despite the facts that the Thirteenth and Fourteenth Amendments were passed originally to secure the rights of a specific group, and that a particular group may have been the original beneficiary of the Amendments, it is now beyond doubt that they are applicable to all citizens. The Equal Protection Clause of the Fourteenth Amendment,which, like 42 U.S.C. § 1985(3), attacks the deprivation of "any person" of the equal protection of the laws, has been invoked to prohibit prejudicially disparate treatment on the basis of sex, alienage, handicap, poverty, corporate status, and a wide range of other nonracial characteristics.
 (citations omitted). In Trautz v. Weisman, 819 F.Supp. at 291, too, the court wrote, "Recognizing that the idea of equal protection is enshrined in both § 1985(3) and the fourteenth amendment, our opinion, though not expressly governed by fourteenth amendment jurisprudence, is at least informed by it."
 
 
 [9]
 This flexible approach to the scope of 1985(3) is not novel. As the Court of Appeals for the Second Circuit has pointed out, flexibility in interpreting section 1985(3) has been demonstrated in a number of contexts: "Cases since Griffin v. Breckenridge have been generous in applying section 1985(3) to nonracial classifications, even though some of the classifications would not receive strict scrutiny under the equal protection clause." Abrams v. 11 Cornwell Company, 695 F.2d at 42 (collecting cases)
 
 
 [10]
 Our reference to the ADA for the purpose of defining the context of "class" under section 1985(3) does not, as the magistrate judge concluded, conflict with the Supreme Court's analysis in Novotny. The Court in Novotny held that "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." 442 U.S. at 377, 99 S.Ct. at 2351. We recognize that section 1985(3) does not create rights but instead is a "purely remedial statute, providing a civil cause of action when some otherwise-defined federal right-to equal protection of the laws or equal privileges and immunities under the laws--is breached by a conspiracy ...." Id. at 376, 99 S.Ct. at 2351. The procreation right which Lake asserts has its source not in the ADA but in the Constitution itself. Our reference to the ADA for the purpose of evaluating whether or not the handicapped have been subjected to invidious discrimination in no way eviscerates the ADA. Indeed, the Supreme Court explicitly recognized in Novotny that "the substantive provisions of last century's Civil Rights Acts" can co-exist with "contemporary legislation conferring similar substantive rights." Id. at 377, 99 S.Ct. at 2351
 
 
 [11]
 It is significant that the two appellate decisions construing section 1985(3) as too narrow to encompass the handicapped pre-dated the enactment of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et. seq. which became effective on January 26, 1992. These decisions did not, therefore, consider the impact of Congress' specific findings with respect to the severity and ubiquity of discrimination against the handicapped