

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-30-1999

# Ridgewood Bd of Ed v. N.E.

Precedential or Non-Precedential:

Docket 98-6276

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Ridgewood Bd of Ed v. N.E." (1999). *1999 Decisions.* Paper 84.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/84

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6276

RIDGEWOOD BOARD OF EDUCATION

v.

N.E., as Guardian Ad Litem for M.E., an infant;
MARY E., Individually and as Guardian Ad Litem for
M.E., an infant,
      Defendants/Third-party Plaintiffs

v.

FREDERICK STOKLEY, Superintendent; JOHN CAMPION,
Director of Special Programs; CHARLES ABATE, Principal;
WILLIAM WARD, Principal; LORRAINE ZAK, Psychologist;
KATHLEEN McNALLY, Social Worker; CAROLINE
JANOVER, LDT-C; GEORGE NEVILLE, Principal;
HENRY HOGUE, Psychologist; JUNE ANN DIBB, Dr.,
Psychiatrist; JOAN CHRISTIAN, LDT-C;
SUSAN LYNAUGH, Psychologist,
      Third-party Defendants

      N.E., as Guardian Ad Litem for M.E., an
      infant; Mary E., Individually and as
      Guardian Ad Litem for M.E., an infant,
      Appellants

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 97-cv-02039
(Honorable Nicholas H. Politan)

Argued November 4, 1998

Before: SCIRICA and ALITO, Circuit Judges,
and GREEN, District Judge*

(Filed March 30, 1999)

REBECCA K. SPAR, ESQUIRE
 (ARGUED)
Cole, Schotz, Meisel, Forman
 & Leonard
25 Main Street
Hackensack, New Jersey 07601

 Attorney for Appellants

CHERIE L. MAXWELL, ESQUIRE
 (ARGUED)
Sills, Cummis, Zuckerman, Radin,
 Tischman, Epstein & Gross
One Riverfront Plaza
Newark, New Jersey 07102

 Attorney for Appellees

OPINION OF THE COURT

SCIRICA, Circuit Judge.

I.

The issue on appeal is whether Ridgewood Board of
Education provided its student M.E. with a "free
appropriate public education" as required by the
Individuals with Disabilities Education Act, 20 U.S.C.A.
S 1400 et seq. (Supp. 1998). The District Court found the
board of education satisfied IDEA because it provided M.E.
"more than a trivial educational benefit." Because we hold
that IDEA imposes a higher standard, we will vacate and
remand.

_____

*The Honorable Clifford Scott Green, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

2

II.

A.

M.E.[1] is a seventeen-year old high-school student whose learning disabilities qualify him as a "child[ ] with disabilities" under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. S 1400 et seq. (Supp. 1998). M.E. has attended schools in Ridgewood Board of Education's school district since the fall of 1988, when he started second grade at the Orchard School. At the beginning of the second grade, his teacher noticed that his academic skills were far below those of his classmates and the school moved him to the first grade. At that time, the school told M.E.'s parents that he did not have a learning disability and was in fact very intelligent.

M.E.'s difficulties continued in the first grade. On the recommendation of his teacher, his parents enrolled him in summer school. Despite this extra instruction, M.E.'s second grade teacher commented that his skills remained very weak. Standardized tests conducted during the second grade confirmed his teacher's assessment: M.E.'s scores ranged between the fourth and ninth percentiles. M.E. again attended summer classes on the school's recommendation.

Hoping that a new school might help their son, M.E.'s parents asked Ridgewood to transfer M.E. to Ridge School, another elementary school in the Ridgewood district, for the third grade. But M.E.'s difficulties continued at Ridge. As a result, Ridgewood and M.E.'s parents agreed that M.E. should receive Basic Skills Instruction twice a week and work with his teacher after school twice a week. M.E.'s parents also had M.E. examined by independent learning disabilities teacher consultant Howard Glaser. Glaser's October 1990 evaluation found that there was a great discrepancy between M.E.'s intellectual abilities and his academic performance: although M.E.'s intelligence was at

_____

1. M.E.'s claims were brought by M.E.'s father as guardian ad litem and his mother as guardian ad litem and individually. To minimize confusion, we also refer to the family as "M.E."

3

the ninety-fifth percentile, his reading skills were at the second percentile. Glaser also found that M.E. was learning disabled and recommended that M.E.'s parents ask Ridgewood to evaluate M.E.

Ridgewood's Child Study Team (CST) evaluated M.E. in March, 1991. The Ridgewood CST agreed with Glaser's assessment that there was a great discrepancy between M.E.'s abilities and his performance in school. It also noted that the discrepancy was growing and that M.E. was becoming very anxious about his academic performance. But it refused to classify him as learning disabled because it concluded that he was not "perceptually impaired" within the meaning of New Jersey law.[2] The Ridgewood CST recommended that Ridgewood provide M.E. with "increased multi-sensory support" and that his parents obtain counseling for him.

M.E.'s academic difficulties continued throughout the remainder of elementary school. In fifth grade, M.E.'s teacher and his parents asked Ridgewood to evaluate him again. Ridgewood refused to do so. In sixth grade, Ridgewood agreed to re-evaluate M.E. only after a learning disabilities teacher consultant hired by M.E.'s parents recommended it do so. The Ridgewood CST's May-June 1994 evaluations consisted of an educational assessment, a psychological assessment, a health appraisal and a psychiatric evaluation. The CST concluded that M.E. remained far behind his classmates and recommended that he and his parents seek counseling to explore his feelings of inadequacy and depression. But the CST maintained that M.E showed no signs of perceptual deficits, again refused to classify him as perceptually impaired and determined that he was not eligible for special education.

M.E.'s in-class troubles worsened during the seventh

_____

2. N.J. Admin. Code tit. 28, S 6:28 (1991) defines "perceptually impaired" as "a specific learning disability manifested in a disorder in understanding and learning, which affects the ability to listen, think, speak, read, write, spell and/or compute to the extent that special education is necessary for achievement in an educational program." New Jersey uses the phrase "perceptually impaired" instead of IDEA's phrase "specific learning disabilities."

4

grade, where he consistently failed English and received incompletes in other classes. Concerned that Ridgewood's CST had erred in failing to classify M.E. as perceptually impaired, M.E.'s parents asked Ridgewood to provide an evaluation by an independent child study team. After the parents filed for an administrative hearing, Ridgewood agreed to the request and contracted with Bergen Independent Child Study Teams for the evaluation. Ridgewood Director of Special Programs John Campion ordered Bergen not to recommend whether M.E. should be classified as perceptually impaired or how he should be educated. M.E.'s parents strongly disagreed with these limitations and asked the Parent Information Center of New Jersey to intervene. After the Parent Information Center determined that Bergen could make classification and placement recommendations, Bergen agreed to make these recommendations in the final team report it would provide to Ridgewood but not in the preliminary evaluation reports individual team members would prepare.

Bergen's team staffing report diagnosed M.E. with a learning disability in reading and writing and recommended that Ridgewood classify him as perceptually impaired. M.E.'s parents allege that Ridgewood intentionally withheld this report from them despite their repeated requests and that Ridgewood gave them the team staffing report only after the New Jersey Department of Education ordered it to do so.

On March 17, 1995, Ridgewood agreed to classify M.E. as perceptually impaired. It recommended that he continue in the Basic Skills Instruction he had been receiving for six years and developed an individualized education program (IEP) for the 1995-96 school year. The IEP called for thirty minutes of individual Orton Gillingham[3] instruction in reading and spelling, resource center instruction in English

_____

3. The Orton-Gillingham technique is a "linguistic-phonetic approach [towards reading] with an emphasis on teaching the student to learn how to decode words." Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 505 n.4 (E.D.N.Y. 1996). It is designed to "enhance a dyslexic individual's capacity to read, write, and spell." Pascoe v. Washingtonville
Cent. Sch. Dist., 1998 WL 684583, at *1 (S.D.N.Y. Sep. 29, 1998).

and supplementary instruction in science and social studies. M.E.'s parents maintain they objected to the IEP and allege that Ridgewood coerced them to agree to it by threatening to break off all discussions concerning M.E.'s educational program unless they approved the IEP. The IEP proved ineffective. M.E. made minimal improvements and Ridgewood changed his grades to pass-fail in order to minimize the impact on his self-esteem.

At the end of the eighth grade, Ridgewood decided that M.E. should no longer be placed in regular classes. For the 1996-97 school year, it proposed an IEP that provided for resource center instruction in all academic classes, two daily periods of supplementary instruction with a teacher trained in the Wilson reading program and speech/language therapy once a week. It also scheduled regular classroom instruction for physical education and electives. M.E.'s parents disagreed with the IEP, claiming it provided fewer services than his inadequate 1995-96 IEP and arguing it would stigmatize M.E., damaging his already-fragile self-esteem. On May 27, 1996, M.E.'s parents requested a due process hearing before the New Jersey Department of Education, contending that Ridgewood's proposed IEP for 1996-97 failed to provide a "free appropriate public education" within the meaning of IDEA and requesting that M.E. be placed in private school at Ridgewood's expense. Concerned that Ridgewood would not provide their son an adequate education, M.E.'s parents began to visit other schools and eventually asked Ridgewood to place M.E. at the Landmark School, a private school in Massachusetts that specializes in educating students with learning disabilities. After Ridgewood refused their request, M.E.'s parents then asked that Ridgewood pay for him to attend Landmark's summer program. After Ridgewood refused, M.E. attended Landmark's summer program at his parents' expense and, according to his instructors there, made steady and considerable progress.

B.

While M.E. was at Landmark, an Administrative Law Judge conducted seven days of hearings on his parents' complaint. In the fall of 1996, M.E. returned to Ridgewood

6

to begin ninth grade. On November 27, 1996, the ALJ held that Ridgewood's 1996-97 IEP failed to provide M.E. with a free appropriate public education. In arriving at this conclusion, she considered the testimony of M.E.'s parents, Howard Glaser, Dr. Mae Balaban of Bergen, M.E.'s classroom teachers and the Ridgewood CST. She also considered a letter written by Dr. Balaban on November 4, 1996, over a month after the last hearing. In that letter, Dr. Balaban criticized the 1996-97 IEP, stating that she was "convinced that [it] will not result in . .. an adequate education." She strongly recommended that M.E. be placed at Landmark, where he would "be given the chance to develop at least average reading and writing skills so as to become a functional adult."

The ALJ then ordered Ridgewood to pay M.E.'s tuition at Landmark, holding such a placement is warranted when"it is shown that it is not appropriate to provide educational services for the pupil in a public setting." Concluding that M.E.'s Landmark placement would remain appropriate until Ridgewood "offers an appropriate program and placement", the ALJ nonetheless refused to order Ridgewood to pay for the non-tuition costs of the Landmark placement. The ALJ also denied M.E.'s request for compensatory education, finding that Ridgewood's failure to classify M.E. as disabled did not rise to the required level of bad faith or willful misconduct. Finally, the ALJ concluded that M.E. was entitled to reimbursement for the tuition costs of attending Landmark's summer program in 1996.

C.

On January 20, 1997, pursuant to the ALJ's decision, M.E. enrolled in Landmark at Ridgewood's expense. In April 1997, Ridgewood filed a complaint in federal court under 20 U.S.C.A. S 1415(i)(2) (1998), an action that had the effect of appealing the ALJ's decision. M.E. brought a counterclaim seeking compensatory education and the non-tuition costs of attending Landmark. He also filed a third-party complaint against various Ridgewood administrators and child study team members, alleging violations of IDEA, the Rehabilitation Act of 1973, 29 U.S.C. S 701 et seq., 42 U.S.C. S 1985(3), 42 U.S.C. S 1983, New Jersey state law

7

and the United States Constitution and seeking compensatory and punitive damages under 42 U.S.C. S 1983.

On July 30, 1998, the District Court reversed the ALJ's decision that Ridgewood had not provided M.E. a free appropriate education. The District Court also held that the ALJ should not have considered Dr. Balaban's November 4, 1996 letter because Ridgewood never consented to its admission and because Ridgewood had not been given a "full and fair opportunity" to cross-examine Dr. Balaban on the portions of the letter that contradicted her live testimony before the ALJ.

In finding that Ridgewood had provided M.E. a free appropriate public education, the District Court stated that IDEA requires only that an IEP provide a disabled student with "more than a trivial educational benefit" and, relying on the testimony of Ridgewood's witnesses and Dr. Balaban, concluded that Ridgewood's IEP had done so. The District Court found that Dr. Balaban never characterized M.E.'s IEP as "inappropriate" but testified that the IEP would provide M.E. with an educational benefit.

Because it reversed the ALJ's determination that Ridgewood had not provided M.E. a free appropriate public education, the District Court also reversed the ALJ's decision that Ridgewood pay M.E.'s tuition at Landmark, stating that even if M.E.'s IEP were inappropriate, no evidence suggested that he could not be educated in a public setting.

The District Court affirmed the ALJ's decision to deny M.E. compensatory education and reimbursement for tutoring expenses. It rejected the ALJ's conclusion that compensatory education requires bad faith, stating our opinion in Carlisle Area School District v. Scott P., 62 F.3d 520 (3d Cir. 1995) established the right to compensatory education once the school district knows or should have known its IEP has failed. But the District Court held M.E. had no right to compensatory education because M.E.'s IEP had not been a failure. At the same time, the District Court dismissed M.E.'s request for expenses and costs in the administrative proceedings because M.E. was no longer the prevailing party.

8

The District Court also granted Ridgewood summary judgment on M.E.'s third-party complaint seeking compensatory and punitive damages under 42 U.S.C. S 1983. M.E.'s S 1983 claims asserted violations of S 504 of the Rehabilitation Act of 1973, the equal protection clause of the Fourteenth Amendment, 42 U.S.C. S 1985 and IDEA. The District Court dismissed M.E.'s S 504 claims because he had not demonstrated he was " `excluded from participation in, denied the benefits of, or subject to discrimination at, the school' " and dismissed his S 1985 claim because he had not shown that the alleged violation of his rights was motivated by "racial or `otherwise class-based' animus." It dismissed M.E.'s IDEA claims because it determined Ridgewood had fully complied with IDEA. In addition, the District Court held all of M.E.'s third-party claims failed "to overcome the qualified immunity enjoyed by municipal employees sued in their individual capacity."

M.E. appealed to this court on August 26, 1998. Before we heard argument, the District Court on September 1, 1998 enjoined implementation of its July 30 order, an act that kept M.E. enrolled in Landmark at Ridgewood's expense. On September 9, a motions panel of this court stayed the District Court's September 1 order, which effectively reinstated the District Court's July 30 order. But M.E. remained at Landmark pursuant to an agreement between his parents and the school. At oral argument on November 4, 1998, M.E. asked this panel to require Ridgewood to pay his Landmark expenses. After oral argument, we ordered Ridgewood to comply with the District Court's September 1 order and pay M.E.'s tuition, residential and transportation costs at Landmark. M.E. remains at Landmark at the present time.

III.

A.

The initial question is whether the District Court erred in deciding that Ridgewood's 1996-97 IEP provided M.E. with a free appropriate education.4 We review the grant of

_____

4. In his brief, M.E. contends the District Court applied an improper standard of review to the ALJ's decision that his 1996-97 IEP was

summary judgment under a plenary standard. See In re Chambers Dev. Co., 148 F.3d 214, 229 n.12 (3d Cir. 1998).

Congress enacted the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. S 1400 et seq., to assist states in educating disabled children. In order to receive funding under IDEA, a state must provide all disabled students with a "free appropriate public education." 20 U.S.C.A. S 1412(1) (Supp. 1998).5  This education must be tailored to the unique needs of the disabled student through an individualized educational program ("IEP"). See Board of Educ. v. Rowley, 458 U.S. 176, 181-82 (1982).

IDEA leaves to the courts the task of interpreting "free appropriate public education." See Rowley, 458 U.S. at 188-89. The Supreme Court began this task in Board of Education v. Rowley, 458 U.S. 176 (1982), holding that while an IEP need not maximize the potential of a disabled student, it must provide "meaningful" access to education, id. at 192, and confer "some educational benefit" upon the child for whom it is designed. Id. at 200. In determining the quantum of educational benefit necessary to satisfy IDEA, the Court explicitly rejected a bright-line rule. Noting that children of different abilities are capable of greatly different achievements, the Court instead adopted an approach that requires a court to consider the potential of the particular disabled student before it. See id. at 202; see also Hall v. Vance Cty. Bd. of Educ., 774 F.2d 629, 635 (4th Cir. 1985) (stating that Rowley holds that "no single substantive standard can describe how much educational benefit is sufficient to satisfy [IDEA]").

We first interpreted the phrase "free appropriate public
_____

inappropriate. Because we will vacate the District Court's judgment that the IEP was appropriate, we need not determine whether the District Court applied the proper standard of review to the ALJ's decision.

5. IDEA defines "children with disabilities" as children who need special education because of "mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." 20 U.S.C.A. S 1401(a)(1)(A)(i) (Supp. 1998).

education" in Board of Education v. Diamond, 808 F.2d 987 (3d Cir. 1986), when we rejected the notion that the provision of any educational benefit satisfies IDEA, holding that IDEA "clearly imposes a higher standard." Id. at 991. Examining the quantum of benefit necessary for an IEP to satisfy IDEA, we held in Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988), that IDEA "calls for more than a trivial educational benefit" and requires a satisfactory IEP to provide "significant learning," id. at 182, and confer "meaningful benefit." Id. at 184. We also rejected the notion that what was "appropriate" could be reduced to a single standard, id., holding the benefit "must be gauged in relation to the child's potential." Id. at 185. When students display considerable intellectual potential, IDEA requires "a great deal more than a negligible [benefit]." Id. at 182.

As noted, the District Court held that an IEP need only provide "more than a trivial educational benefit" in order to be appropriate, equating this minimal amount of benefit with a "meaningful educational benefit." But the standard set forth in Polk requires "significant learning" and "meaningful benefit." The provision of merely "more than a trivial educational benefit" does not meet these standards.

It appears also that the District Court may not have given adequate consideration to M.E.'s intellectual potential in arriving in its conclusion that Ridgewood's IEP was appropriate. Although its opinion discussed the IEP in considerable detail, it did not analyze the type and amount of learning of which M.E. is capable. As we have discussed, Rowley and Polk reject a bright-line rule on the amount of benefit required of an appropriate IEP in favor of an approach requiring a student-by-student analysis that carefully considers the student's individual abilities.

Therefore we will vacate the judgment of the District Court on this issue and remand for proceedings consistent with this opinion.6
_____

6. We see no error in the District Court's decision to strike Dr. Balaban's
November 4, 1996 letter for the reasons stated by the District Court.

11

B.

Because we have vacated the District Court's judgment that Ridgewood provided M.E. with a free appropriate public education, we must review all the judgments that flow from it, specifically, that M.E. was not entitled to placement at Landmark, that he was not entitled to compensatory education, that he was not entitled to expenses and costs as the prevailing party at the administrative hearing and that he could assert no third-party claims under 42 U.S.C. S 1983.

1. Placement at Landmark

The District Court held that Ridgewood was not required to pay M.E.'s tuition at Landmark for the 1996-1997 school year because his IEP had provided him a free appropriate public education. But even if M.E.'s IEP were inappropriate, the District Court said there was no "evidence in the record suggesting that it is not appropriate to provide educational services for [M.E.] in a public setting." M.E. contends the District Court's approach requires a student seeking private placement to show not only that private placement is appropriate but also that all public placements are inappropriate. This approach, he argues, places an impossible burden on the student. We are not convinced that M.E. correctly interpreted the District Court's holding. Nonetheless, we do not believe that IDEA requires the student to prove that all public placements are inappropriate.

To determine when a disabled student is entitled to a private placement, we look to Florence County School District Four v. Carter, 510 U.S. 7 (1993), in which the Supreme Court held that a student may be entitled to reimbursement if "a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under [IDEA]." Id. at 15. Under Florence County, a court may award a disabled student the cost of his private placement if (1) the court determines the student's IEP is inappropriate and (2) the student demonstrates that the private placement he seeks is proper. See Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119,

12

129 (2d Cir. 1998).[7] A private placement may be proper if it is appropriate and provided in the least restrictive educational environment. See Oberti v. Board of Educ., 995 F.2d 1204, 1213 (3d Cir. 1993). To meet the Florence County standard, a disabled student is not required to demonstrate that he cannot be educated in a public setting. Under IDEA, the relevant question is not whether a student could in theory receive an appropriate education in a public setting but whether he will receive such an education. We note the ALJ concluded that Landmark would remain appropriate until Ridgewood offered an appropriate IEP.

Ridgewood contends that the "least restrictive educational environment" requirement bars M.E. from attending Landmark because Landmark's residential program is more restrictive than Ridgewood's. Under this approach, M.E. could receive an inappropriate education in Ridgewood's schools but be denied a private placement because it is more restrictive than placement in a Ridgewood public school. But IDEA requires that disabled students be educated in the least restrictive appropriate educational environment.[8] See Oberti v. Board of Educ., 995 F.2d 1204, 1213 (3d Cir. 1993) (stating that IDEA requires an education to be appropriate and provided in the least restrictive educational environment); Kruelle v. New Castle Cty. Sch. Dist., 642 F.2d 687, 695 (3d Cir. 1981) (stating that inappropriate educational environments are not relevant for "least restrictive environment" analysis); see also Cleveland Heights–University Heights City Sch. Dist. v. Boss, 144 F.3d 391, 400 (6th Cir. 1998) (holding that private school's failure to satisfy least restrictive environment requirement does not bar parents' claim for

_____

7. We note that the District Court has the discretion to determine the appropriate amount of reimbursement. See Florence County, 510 U.S. at 16 (stating that reimbursement is equitable relief to be awarded after consideration of all relevant factors). For example, the student cannot receive total reimbursement if the fees of the private school are unreasonable.

8. We also note that the appropriateness of a private placement is evaluated by the same standard set forth in part III.A. of this opinion. In
other words, parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA.

13

reimbursement); Board of Educ. of Murphysboro v. Illinois Bd. of Educ., 41 F.3d 1162, 1168 (7th Cir. 1994) (stating that the least restrictive environment requirement "was not developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements" and does not apply unless education is appropriate).

We are unable to determine if the District Court applied this standard in concluding M.E. was not entitled to placement at Landmark and therefore will remand this issue to the District Court for reconsideration.

2. Compensatory Education

Under IDEA, a disabled student is entitled to a free appropriate public education until the student reaches age twenty-one. See 20 U.S.C.A. S 1412(2)(B). An award of compensatory education allows a disabled student to continue beyond age twenty-one in order to make up for the earlier deprivation of a free appropriate public education. See M.C. v. Central Reg. Sch. Dist., 81 F.3d 389, 395 (3d Cir. 1996). In Carlisle Area School District v. Scott P., 62 F.3d 520 (3d Cir. 1995), we declined to state a precise standard for the award of compensatory education, but noted that most of our cases awarding compensatory education involve egregious circumstances or the flagrant failure to comply with IDEA. Id. at 536-37. One year later, in M.C. v. Central Regional School District, we "flesh[ed] out the standard left sparse by Carlisle" and held that the right to compensatory education accrues when the school knows or should know that its IEP is not providing an appropriate education. See M.C., 81 F.3d at 396. We specifically rejected a bad faith or egregious circumstances standard, stating that "a child's entitlement to special education should not . . . be abridged because the [school] district's behavior did not rise to the level of slothfulness or bad faith." Id. at 397.

Applied narrowly, M.C.'s "inappropriate IEP" requirement might prohibit the award of compensatory education for years in which a disabled student received an inappropriate education via means other than an IEP.9  But we do not

_____

9. In M.C., we stated that "the right to compensatory education should accrue from the point that the school district knows or should know of

14

think the M.C. court intended such an application because it held the denial of an appropriate education--and not merely the denial of an appropriate IEP--creates the right to compensatory education. See M.C., 81 F.3d at 391-92 ("A school district that knows or should know that a child has an inappropriate [IEP] or is not receiving more than a de minimis benefit must, of course, correct the situation. We hold that . . . a disabled child is entitled to compensatory education for a period equal to the deprivation."); id. at 395 (citation omitted) ("Under IDEA, a disabled student is entitled to free, appropriate education until he or she reaches age twenty-one. A court award of compensatory education requires a school district to . . . make up for any earlier deprivation."). IDEA's central goal is that disabled students receive an appropriate education, not merely an appropriate IEP. Therefore, a disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education.

The District Court rejected M.E.'s request for compensatory education and reimbursement for tutoring because it believed those remedies were available only when an IEP was inappropriate. As noted, it concluded that M.E.'s 1996-97 IEP was appropriate. M.E. maintains that he never received a free appropriate public education from Ridgewood and that he presented substantial evidence that Ridgewood knew or should have known he was disabled shortly after he enrolled at the Orchard School in 1988. He contends that the District Court erred as a matter of law when it dismissed his claim for compensatory education from 1988 to 1997 after a finding that M.E. had received a free appropriate education during the 1996-97 school year. He also contends his parents are entitled to reimbursement for $6,400 in tutoring expenses incurred from 1989 to 1992.

_____

the IEP's failure," M.C., 81 F.3d at 396, and that an "award of compensatory education require[s] a finding that an IEP was inappropriate." Id. at n.6. The M.C. court did not have to consider whether compensatory education was awardable for years in which a disabled student had no IEP because the plaintiff did not ask for compensatory education for such years.

15

Ridgewood responds that M.E. cannot recover compensatory education because he received a free appropriate public education. It also contends there is no evidence of culpable conduct or egregious circumstances, asserting it provided M.E. with extensive assistance. Further, Ridgewood argues M.E.'s parents' failure to object to his programs and placements from 1988 to 1996 created "presumptively a free and appropriate education" during those years and bars claims for compensatory education. Finally, Ridgewood asserts that all compensatory education claims involving events that occurred more than two years ago are barred by a two-year statute of limitations adopted by this court in Jeremy H. v. Mount Lebanon School District, 95 F.3d 272 (3d Cir. 1996).

Whether Ridgewood's 1996-97 IEP provided M.E. with an appropriate education will be decided by the District Court on remand. As we stated in M.C., an award of compensatory education does not require a finding of bad faith or egregious circumstances. See M.C., 81 F.3d at 397. Furthermore, failure to object to M.E.'s placement does not deprive him of the right to an appropriate education. In M.C., we held that "a child's entitlement to special education should not depend upon the vigilance of the parents." See M.C., 81 F.3d at 396. Finally, Ridgewood's statute of limitations argument lacks merit and its reliance on Jeremy H. is misplaced. In Jeremy H. we expressly declined to choose a statute of limitations for IDEA actions, see Jeremy H., 95 F.3d at 280 n.15 ("We . . . need not, and do not, decide between a two-year and a six-year limitations period."), but decided the limitations period begins to run "once the state administrative process has run its course." Id. at 280. Also, Jeremy H. considered the appropriate statute of limitations for IDEA claims brought in Pennsylvania, not New Jersey. See Wilson v. Garcia, 471 U.S. 261, 266-67 (1985) (stating that if a federal statute does not specify a statute of limitations, courts apply the relevant statute of limitations of the forum state); Beauty Time, Inc. v. Vu Skin Sys. Inc., 118 F.3d 140, 144 (3d Cir. 1997) (same); Tokarcik v. Forest Hills Sch. Dist., 665 F.2d 443, 448 (3d Cir. 1981) (same).

In assessing the statute of limitations governing a

16

compensatory education claim brought in New Jersey, we must determine the most analogous cause of action under New Jersey law. An analogous cause of action is a "claim[ ] against [a] public entity" alleging "injury or damage to person," N.J. Stat. Ann. S 59:8-8, under the New Jersey Tort Claims Act, in which the statute of limitations is two years.10 We have previously held that IDEA claims closely resemble actions to recover damages for injuries caused by another. See Tokarcik, 665 F.2d at 454. Another analogous cause of action might be a basic personal injury claim, which also carries a two-year statute of limitations. See N.J. Stat. Ann. S 2A:14-2.

Because M.E. brought his claim for compensatory education within either statute of limitations, we need not decide whether his claim is more analogous to a Tort Claims Act claim or a basic personal injury claim. Under either cause of action, the statute begins to run once plaintiff 's cause of action accrues. See N.J. Stat. Ann. S 59:8-8; N.J. Stat. Ann. S 2A:14-2. As noted, Jeremy H. held that a federal IDEA claim accrues at the conclusion of the state administrative process. See Jeremy H., 95 F.3d at 280. The limitations period for M.E.'s claim began to run on November 27, 1996, when the ALJ issued her ruling, and M.E. filed his complaint on July 3, 1997.

Therefore we conclude the District Court erred when it dismissed M.E.'s claim for compensatory education for the years 1988-1996 on a finding that his 1996-1997 IEP was appropriate. The appropriateness of M.E.'s 1996-1997 education is irrelevant to the appropriateness of his education from 1988 to 1996.11 In addition, our decision to vacate the judgment that M.E.'s 1996-1997 IEP was appropriate compels us to vacate the grant of summary

_____

10. Such a claim must be brought against a "public entity", which includes "any county, municipality, district, public authority, public agency and any other . . . public body in the State." N.J. Stat. Ann. S 59:1-3. Ridgewood meets this definition.

11. Because the dismissal of M.E.'s claim for 1989-1992 tutoring expenses was also based on the conclusion that the 1996-97 IEP was appropriate, we will vacate the dismissal of tutoring expenses claim and remand it to the District Court.

17

judgment on M.E.'s claim for compensatory education for the 1996–1997 school year. On remand, the District Court should determine whether M.E. received an appropriate education in each school year and, if it concludes he did not, determine when Ridgewood knew or should have known of that fact.

## 3. Costs and Fees at the Administrative Hearing

A plaintiff may obtain fees and costs when he "prevails," or obtains merits-based relief that " `materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.' " D.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, 902 (3d Cir. 1997) (quoting Farrar v. Hobby, 506 U.S. 103, 112 (1992)). The District Court denied M.E.'s request for costs and fees because its reversal of the ALJ's decision meant that M.E. was no longer a prevailing party. Our decision to vacate the District Court's reversal requires that we vacate and remand the denial of fees and costs.

## 4. Third-Party Claims Under 42 U.S.C. S 1983

42 U.S.C. S 1983 does not confer substantive rights but "merely redresses the deprivation of . . . rights. . . created by the Constitution or federal statute." W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995). In other words, a S 1983 suit must allege the violation of a federal right provided elsewhere. The District Court granted Ridgewood summary judgment on all of M.E.'s third-party claims because it concluded the third-party complaint asserted individual capacity claims against which the third-party defendants enjoyed qualified immunity. It also held that many of the claims were subject to dismissal on other grounds.

In reviewing the grant of summary judgment, we apply the same standards as does a District Court. We will affirm the grant of summary judgment only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Newport Assocs. Dev. Co. v. Travelers Indemnity Co., 162 F.3d 789 (3d Cir. 1998). Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the

18

duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). Speculation and conclusory allegations do not satisfy this duty. Groman, 47 F.3d at 637.

a. Nature of Third-Party Complaint

In order to prevail on a S 1983 suit brought against defendants in their official capacity, the plaintiff must establish that the deprivation of his rights was the result of an official policy or custom. See Board of Cty. Comm'rs v. Brown, 520 U.S. 397, 400 (1997); Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978).

The District Court held that M.E. provided no evidence that third-party defendants acted pursuant to a municipal policy. M.E. contends his third-party complaint was "clearly brought against third-party defendants in both their individual and official capacities" and that the third-party defendants acted pursuant to "some policy or custom" of Ridgewood. We disagree. M.E. has provided no evidence that Ridgewood's policy is to ignore the responsibilities imposed by IDEA. Rather the evidence presented was that Ridgewood failed to fulfill its responsibilities. Therefore we will affirm the order of the District Court granting summary judgment on this issue.

b. IDEA Claims

Initially we note that the Court of Appeals for the Fourth Circuit recently held that a plaintiff may not sue under 42 U.S.C. S 1983 for IDEA violations because "IDEA provides a comprehensive remedial scheme for violations of its own requirements." Sellers v. School Board, 141 F.3d 524, 529 (4th Cir. 1998). But we must follow our decision in W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995), which held that IDEA claims may be actionable under S 1983. The District Court entered summary judgment on M.E.'s S 1983 claims alleging IDEA violations because it held Ridgewood had "fully complied" with IDEA. M.E. contends the District

19

Court erred when it entered summary judgment on his IDEA claims alleging violations from 1988 to September 1996 on a finding that his 1996-97 IEP was appropriate. He claims that from 1988 to 1996 Ridgewood failed in its obligation to timely evaluate him, to inform his parents of their rights and to provide him with special education.

Because the District Court discussed only the 1996-97 school year, it would appear that the grant of summary judgment on M.E.'s IDEA claims was based solely on a finding that the 1996-97 IEP was appropriate. Because a satisfactory 1996-97 IEP has no bearing on whether Ridgewood complied with IDEA before the 1996 school year, we will vacate the grant of summary judgment on M.E.'s IDEA claims.

c. Section 504 Claims

The Rehabilitation Act of 1973, 29 U.S.C. S 701 et seq. (Supp. 1998), prohibits discrimination on the basis of disability in federally funded programs. In order to establish a violation of S 504 of the Rehabilitation Act, a plaintiff must prove that (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995) (quoting Nathanson v. Medical Coll. of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991)). In addition, the plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability. See id. But a plaintiff need not prove that defendants' discrimination was intentional. See id. We have held that there are few differences, if any, between IDEA's affirmative duty and S 504's negative prohibition and have noted that the regulations implementing S 504 require that school districts "provide a free appropriate education to each qualified handicapped person in [its] jurisdiction." Id. at 492-93.

The District Court granted Ridgewood summary judgment on M.E.'s S 504 claim[s] because it found "no

20

evidence . . . that M.E. `was excluded from participation in, denied the benefits of, or subject to discrimination' " at Ridgewood schools. M.E. argues that Ridgewood violated S 504 when it failed to identify him as learning disabled, when it failed to inform his parents of Ridgewood's IDEA responsibilities and when it failed to provide him a free appropriate public education.

We believe M.E. has presented evidence demonstrating that a genuine issue of fact exists. In W.B. v. Matula, we held that a school's failure to notify parents of its IDEA duties could violate S 504, see Matula, 67 F.3d at 501 n.13, and also held that S 504 imposes a "childfind" duty, or the duty to identify a disabled child "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." Id. at 500-01. In addition, the failure to provide a free appropriate public education violates IDEA and therefore could violate S 504. See id. at 492-93 (stating that IDEA and S 504 impose nearly identical duties and noting that S 504's implementing regulations require that schools provide a "free appropriate public education"). Therefore we will vacate the District Court's grant of summary judgment on M.E.'s S 504 claims and remand for proceedings consistent with this opinion.12

d. Section 1985 Conspiracy Claim

42 U.S.C. S 1985(3) prohibits conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). In order to state a claim under 42 U.S.C. S 1985(3), the plaintiff must allege "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus

_____

12. M.E.'s S 504 claims assert both procedural and substantive violations. In a footnote, the District Court stated "[t]he ALJ determined that [Ridgewood] had complied with IDEA's procedural requirements. This Court finds that the ALJ's conclusion is supported by a preponderance of the evidence in the record." We do not read the ALJ's opinion as finding that Ridgewood complied with IDEA's procedural requirements. The ALJ merely concluded that any procedural violations did not involve bad faith. We do not think this conclusion supports a finding that Ridgewood complied with IDEA's procedural requirements.

21

designed to deprive, directly or indirectly, any person or class of persons . . . [of] the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997). In Lake, we held that the mentally retarded are a class protected by S 1985(3), but we expressly declined to make this determination with respect to handicapped persons. See id. at 685-86 & n.5.

The District Court granted summary judgment on M.E.'s S 1985 claim because it found no evidence that suggested the alleged violation of M.E.'s rights was motivated by racial or "otherwise class-based" animus. We agree. Even were we to decide that S 1985 protects the disabled in general, there is no evidence that Ridgewood's alleged actions were motivated by discriminatory animus towards the disabled.

e. Section 1983 Conspiracy Claim

Count Seven of M.E.'s complaint also alleges a S 1983-only conspiracy. In order to prevail on a conspiracy claim under S 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right. See Dennis v. Sparks, 449 U.S. 24, 29 (1980); Lake v. Arnold, 112 F.3d 682, 689 (3d Cir. 1997). Unlike S 1985(3), a S 1983 conspiracy claim does not require that the conspiracy be motivated by invidious discrimination.

We will affirm the grant of summary judgment on this claim. M.E. has not demonstrated that a genuine issue of material fact exists. At most he has supplied ambiguous allegations and vague inferences that cannot defeat summary judgment. See Groman, 47 F.3d at 633.

f. Qualified Immunity

A municipal official sued in his individual capacity enjoys qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." W.B. v. Matula, 67 F.3d 484, 499 (3d Cir. 1995) (quoting Harlow v. Fitzgerald,

22

457 U.S. 800 (1982)). To defeat qualified immunity in an IDEA action, the plaintiff must show that " `the particular actions taken by defendants were impermissible under law established at that time.' " Matula, 67 F.3d at 500 (quoting P.C. v. McLaughlin, 913 F.2d 1033, 1040 (2d Cir. 1990)). We review the grant of qualified immunity de novo. See Torres v. McLaughlin, 163 F.3d 169, 170 (3d Cir. 1998).

The District Court held that the third-party defendants could assert qualified immunity because there was not "even a scintilla of evidence from which a reasonable fact-finder could infer that the third-party defendants violated M.E.'s clearly established federal rights". Because we addressed qualified immunity in IDEA claims in W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995), we will vacate and remand so that the District Court may reconsider its decision in light of Matula.

g. State Law Claims

The District Court dismissed M.E.'s state law claims alleging violations of the New Jersey Law Against Discrimination and the New Jersey Constitution's guarantee of a thorough and efficient education because it determined third-party defendants enjoyed qualified immunity. Because we have vacated the decision that third-party defendants enjoy qualified immunity, we will vacate the dismissal of M.E.'s state law claims.

IV.

For these reasons, the judgment is affirmed in part and vacated and remanded in part.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit