**MOLLY L., By and Through her natural parents and next friends, B.L. and M.L., Plaintiffs,**

v.

**LOWER MERION SCHOOL DISTRICT, Defendant.**

**CIVIL ACTION NO. 01–602.**

United States District Court, E.D. Pennsylvania.

April 2, 2002.

---

Philip Matthew Stinson, Sr., Stinson Law Associates, P.C., Bryn Mawr, PA, Philip Matthew Stinson, Sr., Stinson Law Assoc., PC, Chester, PA, for Plaintiffs.

Kenneth A. Roos, Gabrielle C. Sereni, Wisler, Pearlstine, Talone, Craig, Garrity & Potash, Blue Bell, PA, for Defendant.

### *MEMORANDUM*

DuBOIS, District Judge.

## I. *INTRODUCTION*

Molly L., is an eight-year-old girl who, with her parents B.L. and M.L., resides within the Lower Merion School District ("the District"). B.L. and M.L. enrolled Molly in the District in February 2000, intending that she enter a first-grade classroom at the beginning of the 2000–2001 school year. Because Molly suffers from disabling conditions, including severe asthma, gross motor difficulties, and extreme sensitivity to sensory stimulations, the District prepared a "Section 504 Service Agreement" under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act" or "Section 504"), and Chapter 15 of the Pennsylvania School Code, enumerating nineteen accommodations that the District would implement on Molly's behalf. B.L. and M.L. rejected the

Section 504 Service Agreement and unilaterally placed Molly in the private Gladwyne Montessori School ("GMS"). B.L. and M.L. then commenced a due process hearing before a Pennsylvania special education hearing officer seeking reimbursement for tuition they paid to GMS. The Hearing Officer rejected the parents' request, finding that the District's accommodations provided Molly with a free appropriate public education.

Molly, through B.L. and M.L. (referred to collectively as "plaintiffs"), subsequently filed a one-count Complaint in this Court under the Rehabilitation Act seeking reimbursement of $9,000 for tuition at GMS, attorney's fees, and independent evaluation fees. Presently before the Court are Plaintiffs' Motion for Summary Judgment on the Administrative Record Below (Document No. 7, filed September 18, 2001), and Defendant's Response to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment (Document No. 8, filed September 28, 2001). As memorialized in the Court's Scheduling Order of July 30, 2001, the parties agree that the Court should decide the case based on the administrative record.

For the reasons set forth in this Memorandum, the Court denies plaintiffs' Motion for Summary Judgment and grants defendant's Cross Motion for Summary Judgment. Accordingly, judgment is entered in favor of defendant and against plaintiffs.

## II. *BACKGROUND*

The facts of the case are taken from the administrative record, and may be summarized as follows:

During the 1999–2000 school year, Molly attended a kindergarten program at the Beth Hillel private preschool. H.O., F.F. No. 3.[1] After B.L. and M.L. enrolled Molly in the District in February 2000, the District assigned four staff members to observe Molly at Beth Hillel. H.O., F.F. No. 9 (citing R. at 27, 71, 97, 128).[2] Molly's teacher at Beth Hillel informed the observing staff members that Molly had a history of being hypersensitive to sensory stimulation, including odors, touch, and loud noises; that Molly had difficulty staying in one position and would rock or rub her body against the chair in which she was sitting; and that Molly needed teacher support when she felt overwhelmed and when she was anxious. H.O., F.F. No. 11 (citing R. at 31, 75, 101, 111–13, 143, 190). Although the District's observers did not see evidence confirming all of the preschool teacher's assessments of Molly, *id.,* the parties agree that Molly has a motor delay of two years, is generally hypotonic, lacks balance when walking, walks slowly, has decreased muscle strength, and has severe problems with asthma and endurance. H.O., F.F. No. 12 (citing R. at 274–77). A psychologist hired by the parents to evaluate Molly, Dr. Karen Berberian, found that Molly was functioning intellectually in the average to high-average range; Dr. Berberian found Molly to be a "charming delightful, socially appropriate, outgoing child," who, "[g]lobally speaking," was "a very competent child." R. at 177.

Based on its staff members' observations, as well as information obtained from the parents, early intervention teachers, therapists, and private physicians, the District prepared a Comprehensive Evalua-

---

1. *"H.O." refers to Special Education Hearing Officer Barbara G. Meranze's decision, which is appended to plaintiffs' Motion as Exhibit 4. "F.F." refers to the Hearing Officer's findings of fact which appear at pages one to three of the decision.*

2. *"R." refers to the record of the proceedings before the Hearing Officer, the entirety of which is appended to plaintiffs' Motion as Exhibit 3. It is this record that the parties agree the Court should evaluate in addressing the pending motions.*

tion Report dated May 24, 2000. H.O., F.F. No. 13. Notwithstanding the alleged inconsistencies between the preschool teacher's assessments of Molly and the District's staff members' observations, the District agreed with the parents that Molly was a disabled child and, therefore, eligible for services under the Rehabilitation Act and Chapter 15 of the Pennsylvania School Code. Accordingly, the District scheduled a meeting with the parents to discuss services that could be provided for Molly upon her entering into a District school; after two meetings were postponed, the parents and the District met on August 29, 2000. H.O., F.F. Nos. 14–16.

Following the August 29, 2000, meeting, the District proposed a Section 504 Service Agreement ("Service Agreement"), which placed Molly at Belmont Hills Elementary School and provided nineteen individual accommodations that purportedly addressed Molly's disabilities. *See* Pls.' Mot. Ex. 1 at 3 ("Accommodations"). Seven of those accommodations are relevant for purposes of the pending motions, as follows:

1. Provision of a "classroom aide" who would be available to Molly throughout the school day. Accommodations at ¶ 3.

2. Use of a "non-verbal signal" to make Molly "aware of inappropriate sensory stimulation." *Id.* at ¶ 5.

3. Having the classroom aide supervise Molly at recess, a physical therapist evaluate Molly on the playground to ensure Molly's safe negotiation of playground equipment, and allowing Molly to enter and exit recess during less congested times. *Id.* at ¶ 7.

4. Allowing Molly "preferential seating" in the school lunchroom "to minimize the environmental influences," giving Molly the "option to eat in a separate, quiet environment

if that is needed," and having an aide in the lunch room. *Id.* at ¶ 9.

5. Having an aide meet Molly at the school bus and allowing Molly to "be the last one off of the bus to avoid being bumped." *Id.* at ¶ 10.

6. Forewarning Molly of "Buzzers that go off at specific times," forewarning the aid of scheduled fire drills so "she can prepare Molly," and, during "unexpected fire drills or emergencies," having the aide "hold Molly's hand" to assist Molly in leaving the building. *Id.* at ¶ 13.

7. Allowing Molly to "opt out of activities that have sensory components that are negative to her" including art class activities. *Id.* at ¶ 14.

On September 8, 2000, B.L. signed the District's Notice of Recommended Assignment; on the Notice B.L. checked a box stating that he did not approve of the District's recommended accommodations and wrote as follows: "Does not appropriately address Molly's needs. Will also be unacceptably restrictive." Pls.' Mot. Ex. 2. The parents had previously notified the District by letter dated August 29, 2000, that they were placing Molly at GMS for the 2000–2001 school year and would be seeking reimbursement of tuition. H.O., F.F. No. 22.

The parents then requested a special education due process hearing seeking reimbursement of tuition they had paid to GMS. A hearing was held before Hearing Officer Barbara G. Meranze ("Hearing Officer") on three separate dates: November 1, 2000, November 22, 2000, and December 4, 2000. Thereafter, the Hearing Officer issued an undated decision including findings of fact, a discussion of the case, and four orders. Pls.' Mot. Ex. 4. The Hearing Officer concluded that the District had provided a free appropriate public education in the accommodations included in

the Section 504 Service Agreement, H.O. Order No. 1, and, accordingly, concluded that the parents were not entitled to tuition reimbursement. H.O. Order No. 2. Despite these rulings in favor of the District, the Hearing Officer also ordered the District to "meet with the [parents] and enlarge upon the accommodations offered, so that the [parents] are aware of the extent of what is being offered." H.O. Order No. 3. Additionally, the Hearing Officer ordered the District to "arrange for the modulation of bells and buzzers in the areas of the Belmont Hills School to which Molly is to be assigned." H.O. Order No. 4.

Plaintiffs then commenced the present action under the Rehabilitation Act, seeking reimbursement of tuition, attorney's fees, and independent evaluation fees.

### III. *DISCUSSION*

Plaintiffs argue in their Motion that the seven specific accommodations in the Section 504 Service Agreement discussed above, *see supra* § II, were "not educationally appropriate." Specifically, plaintiffs assert that the Service Agreement was inappropriate in that it provided for: (1) a one-on-one aide who would have singled Molly out from her peers; (2) the use of non-verbal signals to make Molly aware of inappropriate sensory simulation; (3) Molly's participation in recess periods with very large groups of children; (4) including Molly in a large school lunchroom or excluding Molly from peer interaction during the daily lunch period; (5) transporting Molly to and from school on a daily basis in a large school bus; (6) using loud buzzers in Molly's presence and forewarning Molly about pending buzzer activations notwithstanding the fact that such warnings would not help Molly tolerate the buzzer noise; and (7) allowing Molly to opt out of activities without first calling for adaptations and modifications of activities. Plaintiffs also raise a general, catchall, ar-

gument based on the testimony of Molly's treating psychologist, Dr. Berberian, that the accommodation plan would not allow Molly to make meaningful educational progress.

Aside from bare citations to the record purportedly supporting plaintiffs' assertions that the above-listed accommodations are not educationally appropriate, plaintiffs provide *no* argument as to why the accommodations are inappropriate. The District counters plaintiffs' conclusory arguments by asserting that plaintiffs' witnesses testified inconsistently and, generally, failed to explain how the accommodations in the Service Agreement were inappropriate. Before addressing the parties' arguments, the Court will briefly discuss the legal principles governing the Court's evaluation of plaintiffs' Rehabilitation Act claim.

### A. GOVERNING LEGAL PRINCIPLES

The Court divides its analysis of the governing legal principles into two separate sections considering (1) the substantive law and (2) the appropriate standard of review the Court should adopt in evaluating the administrative record.

#### 1. Substantive Law

■ The substantive requirements of the Rehabilitation Act in the education context are equivalent to the requirements set forth in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). *See Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999) (*"Ridgewood"*) (citing *W.B. v. Matula*, 67 F.3d 484, 492–93 (3d Cir.1995)) (explaining Third Circuit's holding that "that there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition"). The regulations implementing the Rehabilitation Act track the language of IDEA and provide that dis-

tricts subject to the Act's requirements "shall provide a free appropriate public education to each qualified handicapped person who is in the [district]'s jurisdiction." 34 C.F.R. § 104.33(a); *see also* *W.B.*, 67 F.3d at 493 (discussing Rehabilitation Act implementing regulations). Thus, although IDEA does not apply in this case,[3] the Court's analysis is informed by IDEA and cases interpreting that statute.

For plaintiffs to prevail on their Rehabilitation Act claim, they must prove that (1) Molly is "disabled" as defined by the Act; (2) Molly is "otherwise qualified" to participate in school activities; (3) the District is a "recipient" of federal financial assistance; and (4) Molly was excluded from participation in, or denied the benefits of education in the District. *Ridgewood*, 172 F.3d at 253. Plaintiffs need not prove that the School District's allegedly discriminatory acts were intentional. *Id.* The parties agree that the only disputed element of the § 504 analysis is the fourth element—whether Molly was excluded from participation in, or denied the benefits of education in the District. The sole question for this Court's consideration is, therefore, whether the District's Section 504 Service Agreement provided a "free

appropriate public education." There clearly is no question as to whether the education was "free" or "public"; thus, the Court must determine whether the District's proposed Section 504 Service Agreement provided an "appropriate" education.

An "appropriate" education "is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy" the regulatory requirements of 34 C.F.R. § 104.34 (educational setting), 34 C.F.R. § 104.35 (evaluation and placement), and 34 C.F.R. § 104.36 (procedural safeguards). 34 C.F.R. § 104.33(b)(1). There are no bright line rules to determine when a school district has provided an appropriate education as required by § 504 and when it has not. The Third Circuit has explained in the IDEA context that the "appropriate" education requirements mean that the District must "provide 'significant learning' and confer 'meaningful benefit.' " *T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir.2000) (quoting *Polk v. Cent. Susquehanna Intermediate*

---

**3.** IDEA and the Rehabilitation Act differ in the scope of their coverage. As one court has explained:

> Although the two laws overlap significantly, it is well recognized that Section 504 covers more students than does the IDEA. Students with disabilities who are eligible for services under IDEA are also covered by the prohibitions against discrimination on the basis of disability in Section 504 and its implementing regulation at 34 CFR Part 104, but students covered only by Section 504 are not entitled to the rights and protections enumerated by IDEA and its implementing regulations at 34 CFR Part 300. *Grant v. St. James Parish Sch. Bd.*, No. Civ. A. 99–3757, 2000 WL 1693632, at *4 (E.D.La. Nov. 8, 2000) (citation omitted); *see also Muller v. Comm. on Special Educ. of E. Islip*

*Union Free Sch. Dist.*, 145 F.3d 95, 100 n. 2 (2d Cir.1998) ("The purposes of the Rehabilitation Act are similar to that of the IDEA, but the Rehabilitation Act is broader in scope....The definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA.").

IDEA only applies to children who, by reason of their disabilities, "need[ ] special education." 20 U.S.C. § 1401(3)(A)(ii). The parties agree that, although Molly qualifies for protection under the Rehabilitation Act because she is an "individual with a disability" as defined in that statute, *see* 29 U.S.C. § 705(20), Molly does not need special education and, therefore, does not qualify for protection under IDEA.

*Unit 16,* 853 F.2d 171, 182, 184 (3d Cir. 1988)). However, the District "need not maximize the potential of a disabled student." *Ridgewood,* 172 F.3d at 247; *see also Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 533–34 (3d Cir.1995) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (explaining that "[d]istricts need not provide the optimal level of services, or even a level that would confer additional benefits" because IDEA requires "only a 'basic floor of opportunity' ").

The Court notes that, in Rehabilitation Act cases, the Second Circuit has characterized an "appropriate" education—in terms familiar in the employment context—as a "reasonable accommodation": "While a federal funds recipient must offer 'reasonable' accommodations to individuals with disabilities to ensure meaningful access to its federally funded program, § 504 does not mandate 'substantial' changes to its program." *J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 70 (2d Cir.2000) (quoting *Alexander v. Choate,* 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)). In light of this principle, the Second Circuit explained, courts evaluating whether a school district has provided an appropriate education "should be 'mindful of the need to strike a balance between the rights of the student and his parents and the legitimate financial and administrative concerns

of the School District.' " *Id.* at 70–71 (citing *Rothschild v. Grottenthaler,* 907 F.2d 286, 293 (2d Cir.1990)). As another court has held in the Rehabilitation Act context, "an appropriate education is one that is '*reasonably* calculated to enable the child to achieve passing marks and advance from grade to grade.' " *Benik v. Lisle Cmty. Unit Sch. Dist. # 202,* No. 95–C–6392, 1999 WL 342501, at \*4 (N.D.Ill. May 17, 1999) (quoting *Rowley,* 458 U.S. at 204, 102 S.Ct. 3034) (emphasis added).

■ These Rehabilitation Act cases thus stress that an "appropriate" education is one that reasonably accommodates the needs of a handicapped child. Although the Third Circuit has not specifically addressed the reasonable accommodation issue in relation to the Rehabilitation Act's requirement of an "appropriate" education, this Court concludes that a reasonable accommodation analysis comports with the Third Circuit's explanation that an "appropriate" education must "provide 'significant learning' and confer 'meaningful benefit,' " *T.R.,* 205 F.3d at 577 (quoting *Polk,* 853 F.2d at 182, 184), but that it "need not maximize the potential of a disabled student." *Ridgewood,* 172 F.3d at 247.

■ The District bears the burden of proving that it provided Molly with an appropriate education in line with these principles.[4] *See Carlisle,* 62 F.3d at 533

---

4. The Third Circuit has also interpreted IDEA—and, thus, the Rehabilitation Act—to "require that a disabled child be placed in the least restrictive environment (hereinafter 'LRE') that will provide him with a meaningful educational benefit." *T.R.,* 205 F.3d at 578; *see also* 34 C.F.R. § 104.34 (incorporating LRE requirement under Rehabilitation Act). "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle,* 62 F.3d at 535. Although, plaintiffs refer to the "least restrictive environment" require-

ment in their motion for summary judgment, *see* Pls.' Mot. at ¶¶ 8–9, plaintiffs do not press this argument further. None of plaintiffs' enumerated objections to the Hearing Officer's conclusions specifically assert that the District's Section 504 Service Agreement violated the "least restrictive environment" requirement. Rather, plaintiffs' arguments are limited to assertions that specific accommodations were "not educationally appropriate." *See* Pls.' Mem. of Law at 3–5. For this reason, the Court, in analyzing plaintiffs' arguments, will not apply the Third Circuit's two-pronged "least restrictive environment" test to the facts of this case. *See T.R.,* 205 F.3d at

(citing *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1219 (3d Cir.1993); *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1035 (3d Cir.1993)). If the District cannot demonstrate that it met this requirement, plaintiffs may obtain reimbursement for tuition in a private school, as long as the private school provides the appropriate education that the District has failed to provide. *Ridgewood*, 172 F.3d at 248 (citing *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)).[5]

## 2. Standard of Review of Administrative Record

The District urges the Court to adopt a deferential standard of review and treat the Hearing Officer's findings as "prima facie" correct. At the outset, the Court notes that the Third Circuit has not ruled on the standard of review in a Rehabilitation Act case. The District's argument is based on the language of IDEA which specifically addresses federal review of administrative proceedings in cases brought under that statute. IDEA provides that a District Court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). Although that statute does not explicitly so provide, "the Supreme Court has required that federal dis-

trict courts afford 'due weight' to state administrative proceedings in evaluating claims under IDEA." *Carlisle*, 62 F.3d at 527 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034).

The Court concludes that the District has overstated the degree of deference the Court owes to the findings and conclusions of the Hearing Officer. The Third Circuit has explained that, under the "due weight" standard, "district courts have discretion to determine how much deference to accord the administrative proceedings"; in IDEA cases, a district court "must consider the administrative findings of fact," but it is "free to accept or reject them." *Id.* (citing *Oberti*, 995 F.2d at 1219) (quotations omitted). If a district court "chooses to depart from the agency's ruling, it should provide some explanation for its departure." *Id.*

The District has cited no language in the Rehabilitation Act similar to the language in IDEA which led the Supreme Court in *Rowley* to direct district courts to give "due weight" to administrative findings. On this issue, one court has stated that "[t]hough the IDEA and Section 504 are similar in their substantive requirements . . ., the [School] Board has not shown why the procedural requirements of the two statutes should be employed interchangeably." *Palmyra*, 2 F.Supp.2d at 640 n. 3. On the other hand, another court has assumed—without discussion—that the same standards of review apply under both

579 (citing *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1215 (3d Cir.1993)) (setting forth "two-part test for assessing compliance with the LRE requirement" examining (1) provision of education in the regular classroom and (2) mainstreaming of the child to the maximum extent possible).

5. Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA. *See Borough of Palmyra, Bd. of Educ. v. F.C.*, 2 F.Supp.2d 637, 641–42

(D.N.J.1998) (stating that tuition reimbursement is "consistent with the regulations implementing Section 504"); *Christen G. v. Lower Merion Sch. Dist.*, 919 F.Supp. 793, 798 (E.D.Pa.1996) ("Courts have often approved relief in the form of tuition reimbursement to the parent for the costs of educating her child during the period in which the school district failed to offer a free appropriate public education in accordance with its obligations under the IDEA.").

IDEA and the Rehabilitation Act. *Grant,* 2000 WL 1693632, at *4 n. 17.

It is not necessary, however, to resolve this issue in this case because, even under the "due weight" standard, which the Court utilizes, the Court has discretion to defer—or not defer—to the administrative findings. As the below analysis demonstrates, the Court agrees with many of the Hearing Officer's findings and conclusions and exercises its discretion to adopt those findings and conclusions. The Court would reach the same result if it were to conduct a *de novo* review of the record, the least deferential standard of review.

### B. ANALYSIS OF THE DISTRICT'S SECTION 504 SERVICE AGREEMENT

█ With the above principles as a backdrop, the Court will address in turn each of the seven accommodations plaintiffs assert to be educationally inappropriate. Additionally, the Court will consider plaintiffs' final, catchall, argument that the entirety of the District's proposed accommodations was inappropriate.

#### 1. Classroom Aide

In its Section 504 Service Agreement, the District stated that it would make "a 'classroom aide' available to [Molly] throughout her schoolday." Accommodations at ¶ 2. Plaintiffs' sole citation in support of their argument that the aide was "not educationally appropriate" is to the testimony of Molly's physical therapist, Gwen Freedman. *See* R. at 281. Freedman testified that an aide would be inappropriate because the aide "would single [Molly] out as somebody different." *Id.* As Freedman explained further, it was her opinion that Molly "needs to be able to navigate her environment without somebody with her all the time, that she needs to be able to learn coping skills in the normal school environment." *Id.*

As the District points out, however, Freedman's unfavorable view of an aide directly contradicts her earlier testimony where she stated that Molly should be "supervised." R. at 278. Specifically, Freedman stated:

I worry about her getting winded with the asthma. She oftentimes will continue with an activity even though she appears to be wheezing. So, she needs *somebody* that's going to watch over her so she won't get into trouble with the asthma. Also *somebody* that can see if she's too tired to complete an activity, or watch for people bumping into her, falling.

R. at 278–79 (emphasis added). The Court finds that the School District's willingness to accommodate Molly with a classroom aide would provide the exact "somebody" whom Freedman testified would be necessary to "watch over" Molly.

To the extent that plaintiffs view the aide as restricting Molly's opportunity to develop coping skills, the Court notes that the Hearing Officer found otherwise: "The aide is listed in the accommodations as available to Molly, and does not need to behave as if she were a Siamese twin." H.O., Discussion at 3. As the Hearing Officer explained further, the classroom aide would "be assigned to the classroom and be available to everyone, knowing that her primary duty is to Molly." *Id.* at 3–4. On the basis of these findings, the Hearing Officer concluded: "I do not find this accommodation to be overly excessive and hold it to be appropriate." *Id.* at 4.

The Court concludes that the Hearing Officer's finding that the classroom aide would not be a "Siamese twin," but, rather, would be available to Molly when Molly needed assistance is well-supported by the record. The Court finds that provision of an aide who would intervene on an as-needed basis serves the dual purposes of

allowing Molly freedom to develop coping skills while, at the same time, ensuring Molly's health and safety. Accordingly, the Court concludes that the District's provision of an aide is well-targeted toward accommodating Molly's disabilities. This particular accommodation is therefore commensurate with an "appropriate" education under the Rehabilitation Act.

### 2. Non–Verbal Signal

The District's Section 504 Service Agreement provided that: "Teacher, aide and Molly will develop a non-verbal signal to make her aware of inappropriate sensory stimulation."[6] Accommodations at ¶ 5. Plaintiffs cite to three pieces of testimony where witnesses levied criticism on this specific accommodation.

First, plaintiffs point to the testimony of Molly's psychologist, Dr. Berberian, who stated that, because she believed "this kind of wiggling and squirming is based on [Molly's] sensory integration or sensory threshold issues, the appropriate intervention would be either physical therapy or occupational therapy to help her get the control that she needs to sit still rather than simply indicating to her that she should stop doing it." R. at 199. The Court notes that Dr. Berberian's criticism does not advance plaintiffs' argument that the Section 504 Service Agreement was inappropriate because the District offered to do exactly what Dr. Berberian recommended—provide Molly with physical therapy and occupational therapy. Accommodations at ¶¶ 18, 19.

To the extent that Dr. Berberian objected to the District's non-verbal signal accommodation on the grounds that it would not be effective, see R. at 199 ("If she could stop doing it, she wouldn't be doing it."), the Court notes that Molly's pre-school teacher used "a little cue to put Molly back on track." R. at 80. The Hearing Officer found the evidence to establish that the "cue" was successful in the pre-school. H.O., Discussion at 4. Upon its own review of the record, the Court agrees with the Hearing Officer's finding that Dr. Berberian's concerns are unfounded.

The second piece of evidence that plaintiffs cite with respect to the non-verbal signal is the testimony of Gwen Freedman, Molly's physical therapist, who expressed concern that the proposed aide would remove Molly from the classroom after giving the signal. R. at 282. However, plaintiffs do not point to any evidence in support of this concern, and the Court finds no such evidence in its review of the record. The Court therefore concludes that Freedman's concerns are unfounded.

The third, and final, piece of evidence cited by plaintiffs is the testimony of Anne Moscony, Molly's occupational therapist. Moscony expressed two objections to the use of a non-verbal signal: first, that the signal would cause Molly to experience stress because she would not know that her behavior was inappropriate; and, second, that the described behavior is not necessarily inappropriate. R. at 319–20. The Court finds that Moscony's first objection is countered by the evidence discussed above that Molly's pre-school teacher had success using a non-verbal signal in response to the Molly's behavior. As for Moscony's second objection, whether Molly's actions are judged to be "inappropriate" is irrelevant. Rather, the point of this accommodation is to allow Molly' s teacher and/or aide to ensure that Molly maintains focus in the classroom. Moreover, even if B.L. and M.L. vehemently

---

**6.** "Inappropriate sensory stimulation" refers to Molly's occasional "behavior which has resembled masturbation," rubbing her body against a chair in which she was seated. R. at 199.

objected to use of the non-verbal signal, the Hearing Officer found that it was not an integral part of the Section 504 Service Agreement and "could be excluded." H.O., Discussion at 4.

For all of the aforesaid reasons, the Court concludes that plaintiffs' objections to the District's proposed accommodation involving an aide's use of a non-verbal signal do not support plaintiffs' argument that the District failed to provide Molly with an appropriate education. On the contrary, the Court concludes that the non-verbal signal would be an unintrusive, and proven, means of keeping Molly on track in the classroom, and, therefore, part of an appropriate education.

### 3. Recess

The District's Section 504 Service Agreement included a set of accommodations involving Molly's participation in outdoor recess. Specifically, the District provided: "Aide will supervise recess. [Physical therapist] will evaluate Molly on the playground to assure she is able to safely negotiate playground equipment. Molly will be allowed to enter and exit recess during less congested times." Accommodations at ¶ 7.

Plaintiffs cite to three pieces of testimony in support of their assertion that this accommodation was inappropriate. First, plaintiffs cite the testimony of Dr. Berberian, who stated: "I don't think that an aide can adequately monitor recess at a typical public school where there might be . . . 100 or more people out on a playground at a given time." R. at 200. Plaintiffs' second citation is to the testimony of Gwen Freedman, who raised similar concerns about the ability of an aide to ensure Molly's safety: "I feel that if there are too many children on the playground, it's very difficult for [Molly]. Her balance and equilibrium being what it is, I think it's difficult." R. at 282. Freedman further opined that

allowing Molly to enter and exit the school separately from other children would not address this issue: "[E]ven though she would be allowed to enter and exit during less congested times, she'd still be on the playground and with all the children." *Id.*

In their third citation, to the testimony of Anne Moscony, plaintiffs raise contradictory concerns. Whereas Berberian and Freedman expressed doubt that an aide would be able to ensure Molly's safety, Moscony believed that an aide at recess was inappropriate because "it separates her from her peers." R. at 320. Instead of an aide, Moscony thought "[o]ther strategies" would be more appropriate for Molly, such as "put[ting] her in an environment where recess is not a stressful activity, where there's a limited number of children, where it's a familiar environment, where the expectations are very clear." R. at 321–22.

Plaintiffs' citation to these three pieces of testimony demonstrates that plaintiffs would find the District's plan appropriate only if it provided a recess for Molly that included both a small number of children and limited supervision. Such a plan would require the District to create an entirely separate recess for a select group of children. Plaintiffs provide no authority for the proposition that either IDEA or the Rehabilitation Act requires a school district to take such steps; nor does the Court interpret those statutes to impose such a requirement. On the contrary, in light of the "the need to strike a balance between the rights of the student and [her] parents and the legitimate financial and administrative concerns of the School District," *J.D.*, 224 F.3d at 70–71 (quotations omitted), the Court concludes that plaintiffs' arguments with respect to the recess accommodations ask the District to go well beyond its legal duty to provide an appropriate education.

In so concluding, the Court notes its agreement with the Hearing Officer's conclusion that the District's recess accommodations were appropriately flexible. On the one hand, the accommodations address Moscony's concerns that an aide would separate Molly from her peers, because, "if Molly were with friends and making a good adjustment with them, she would not be restricted from doing so." H.O., Discussion at 4. On the other hand, the accommodations address Berberian's and Freedman's concerns about the large number of children involved in outdoor recess: "should [Molly] feel the need for support, the aide would be there to provide it." *Id.* The Court concludes that this flexible approach, which allows Molly freedom to play with her classmates at recess and, at the same time, provides supervision to protect Molly's safety and sensitivities to being bumped by other children, constitutes an appropriate education.

### 4. Lunch

To deal with Molly's sensitivities to odors and noises, the District's Section 504 Service Agreement contains a set of accommodations with respect to lunch in the school cafeteria: "In the lunchroom, [Molly] will have preferential seating to minimize the environmental influences. . . . She will have the option to eat in a separate, quiet environment if that is needed." Accommodations at ¶ 9. Additionally, the District provided that an aide would be in the lunchroom with Molly. *Id.*

In objecting to the appropriateness of this accommodation, plaintiffs cite to Dr. Berberian's testimony. Dr. Berberian first appears to object to Molly eating lunch in the school's main lunch room: "She should be eating lunch with other children in a setting she could handle." R. at 202. On the other hand, Dr. Berberian did not approve of "the idea that [Molly] would be taken out of the lunchroom if the noise level or the odor level or the pushing and shoving are too difficult for her to handle." R. at 201–02. Having Molly leave the lunch room, Dr. Berberian asserted, would remove Molly "from an important social event in an elementary school." R. at 202.

The Court agrees with the District that plaintiffs' citation to Dr. Berberian's dual criticism of the lunch room accommodations shows that plaintiffs are arguing that "an alternative to the school's cafeteria must be created solely for Molly, and that other classmates be required to join her in this alternative setting." Def.'s Mem. of Law at 23–24. As with the Court's decision on the District's recess accommodations, *see supra* § III.B.3, the Court concludes that plaintiffs' argument would require the District to exceed its legal duty to provide an appropriate education.

The District's proposed accommodations amount to a practicable compromise. By arranging for special seating in the lunch room, the accommodations seek to minimize the sensory stimulations to which Molly is most sensitive, while, at the same time, maintaining an important degree of peer interaction. The Court concludes that this compromise position is more than sufficient to satisfy the District's duty to provide Molly with an appropriate education.

### 5. School Bus

To accommodate Molly's sensitivity to being jostled by other students while entering or exiting a school bus, the District's Section 504 Service Agreement provided that Molly "will be met at the bus by the aide and be the last one off the bus to avoid being bumped." Accommodations at ¶ 10.

Plaintiffs, in objecting to this accommodation, point to Dr. Berberian's testimony that it would be more appropriate for Mol-

ly to ride to and from school in a "small bus" as opposed to a "large bus." R. at 202. Dr. Berberian's reasoning behind this conclusion is apparently that Molly "has trouble getting off of school buses and onto school buses, is easily overwhelmed by the number of children." R. at 194. Further, Dr. Berberian testified, Molly "[n]eeds to really know where she is going to sit and needs to be prevented or protected from being pushed or shoved or jostled." R. at 194–95.

Even accepting plaintiffs' concerns as appropriate, there is no record support—either from Dr. Berberian or any other witness—to suggest *why* a small bus is more appropriate than a large bus. Additionally, the Court notes that even Dr. Berberian admitted that Molly "has been able to handle being on a large school bus for infrequent school trips." R. at 195. As the Hearing Officer found, Molly has "somewhat selective distress" with respect to buses "in that she is able to go on field trips." H.O., Discussion at 4.

For these reasons, the Court agrees with the Hearing Officer and rejects plaintiffs' suggestion that the mere size of a school bus would, in and of itself, render the District's Service Agreement inappropriate. Rather, the Court finds that the District's plan targets exactly the concerns that appear to be paramount for plaintiffs—the fact that Molly might be jostled or bumped by her classmates when entering and exiting the bus. Providing an aide who would assist Molly in entering and exiting the bus is a practical solution to address Molly's sensory sensitivities. The Court therefore concludes that the school-bus-related accommodation is appropriate.

### 6. Buzzers and Other Loud Noises

In order to accommodate Molly's sensitivity to loud noises, the District provided in its Section 504 Service Agreement that Molly would be "forewarned on Buzzers that go off at specific times." Accommodations at ¶ 13. Additionally, the District provided that "Molly's aide will be forewarned of scheduled fire drills so she can prepare Molly," and "[i]n the case of unexpected fire drills or emergencies the aide will hold Molly's hand and assist in escorting her out of the building." *Id.*

Plaintiffs, in objecting to the appropriateness of this accommodation, cite to Dr. Berberian's assertion that "the general idea of being forewarned about buzzers that are going off is not going to help her tolerate the buzzers." R. at 203. Because "simply telling [Molly] that there is about to be a loud noise is not going to make it any better for her," Dr. Berberian explained, "this is an issue that needs to be addressed through her [occupational therapy] or [physical therapy] services." *Id.*

Initially, the Court notes that Dr. Berberian's credibility on this assertion must be questioned in light of the fact that she, admittedly, has never observed Molly react to a loud noise. R. at 213. But, even if Dr. Berberian's assertions are correct, the Court finds that the District's planned accommodations do exactly as Dr. Berberian suggests by providing Molly with both occupational and physical therapy. *See* Accommodations at ¶¶ 18–19. In light of this fact, plaintiffs can not successfully argue that the District's accommodation is inappropriate. The mere fact that the District proposed warning Molly of impending loud noises does not render the accommodation any less appropriate; the Court finds that such efforts are a practical, interim, measure for addressing the symptoms of Molly's sensitivities while her therapists work toward a more comprehensive solution.

Finally, the Court notes that, pursuant to the Hearing Officer's orders, the District's Service Agreement would integrate the features of the Belmont Hills Elemen-

tary School's public address system so as to lower the volume of buzzers in areas of the school where Molly would be placed. *See* H.O., Discussion at 4; H.O., Order No. 4. This additional step, in tandem with the accommodations the District initially proposed, compels the conclusion that the District's proposals in relation to Molly's sensitivities to loud noises are educationally appropriate.

### 7. Adaptation and Opting Out of Classroom Activities

As a general means of accommodating Molly's sensitivities to sensory stimulation, the District's Section 504 Service Agreement provided that "Molly needs to be allowed to opt out of activities that have sensory components that are negative to her. This will include activities in art class." Accommodations at ¶ 14.

In objecting to this accommodation, plaintiffs point to Dr. Berberian's testimony concerning the necessity of *ex ante* adaptations of an activity, as opposed to Molly's opting out of the activity. Specifically, with respect to art class, Dr. Berberian testified that "[i]t would be much more appropriate to have the art teacher think in advance about whether Molly would react to the activities or supplies and either to use a different kind of paint or paste or paper or whatever so that Molly can participate in the activity...." R. at 203.

The Court agrees with Dr. Berberian's conclusion that Molly "shouldn't miss art class." *Id.* The Court also notes that the District agrees with Dr. Berberian on this issue. As Dr. Lisa Dissinger, a consulting psychologist for the District, testified, the District's accommodations envisioned that Molly's teachers would first try to make Molly comfortable with an activity before giving her the option to opt out of the activity. R. at 116. The District's efforts in this regard would be specifically target-ed toward those activities, like cooking and art classes, where Molly might be expected to be especially sensitive to sensory stimulation. As Karen Penzarella, a contract occupational therapist for the District, testified, in cooking class, Molly could be given a task that did not involve direct work with foods. For example, if the class "were making something with a strong odor, [Molly] could be doing another activity such as washing the dishes or reading the recipe." R. at 87. As another example, in art class, Molly's tasks could be adapted so that if an activity "was overstimulating for her, she could have another activity to work on that would have something to do with the overall activity so she's not singled out." R. at 87–88.

The Court additionally notes that, in some cases, plaintiffs' own witnesses agreed that opting out of an activity would be Molly's best option. As Molly's physical therapist, Gwen Freedman, stated in a report which was the subject of her testimony, strenuous activity might result in the need for Molly to "opt out" of an activity. R. at 291; *see also* R. at 77 (testimony that Molly's pre-school teacher informed District personnel that Molly "needs to have the option not to participate if she chooses").

In light of this testimony, the Court concludes that the District's proposed accommodations are directly targeted at addressing the concerns raised by Dr. Berberian. Additionally, to the extent that Dr. Berberian's testimony can be read to object to *any* allowance for Molly to opt out of activities, the Court rejects such an argument on the grounds that it is inconsistent with what other professionals have found to be appropriate means of accommodating Molly's disabilities. Accordingly, the Court finds that the District's proposed accommodations allowing Molly to

opt out of activities are educationally appropriate.

### 8. General Appropriateness of District's Accommodations

As can be seen from the Court's description of plaintiffs' arguments, plaintiffs' position that the District's Section 504 Service Agreement was not educationally appropriate relies heavily on Dr. Berberian's testimony. In their final objection to the District's proposed accommodations, plaintiffs cite to Dr. Berberian's global evaluation of the Service Agreement: "I don't think that these [accommodations] are appropriate and that Molly would make meaningful educational progress were these accommodations in place." R. at 205.

Dr. Berberian's statement is of no assistance to plaintiffs because the Court has already rejected the reasoning behind the conclusion—that "Molly is not going to be participating in activities that are a necessary part of elementary school, including lunch, recess, art, assembly and that to have her removed from the activities or sit out activities is not appropriate." R. at 204. As the Court has concluded throughout this discussion, *see supra* §§ III.B.1–7., Dr. Berberian's concerns about Molly's participation in school activities are unsupported.

Additionally, further examination of Dr. Berberian's testimony demonstrates that her opinions as to the appropriateness of the District's proposals are based on an improper understanding of the District's burden under the Rehabilitation Act. As stated above, *see supra* § III.A.1., an "appropriate" education is not necessarily one that "maximize[s] the potential of a disabled student." *Ridgewood*, 172 F.3d at 247. The District is not required to pro-

vide Molly with the best possible education. *See Carlisle*, 62 F.3d at 533–34 ("Districts need not provide the optimal level of services."). Dr. Berberian's testimony, however, demonstrates that her view—and, plaintiffs' view—of an appropriate education is an overly idealized one. Specifically, Dr. Berberian appears to consider the District's accommodations educationally inappropriate merely because, in her view, GMS provided an education *better* suited to Molly's disabilities. *See* R. at 205–10 (Dr. Berberian's testimony about her observations of Molly in a GMS classroom).

Assuming that Dr. Berberian could credibly compare the two educational programs,[7] whether GMS's educational program might be objectively viewed as "better" than the District's is irrelevant to the Court's analysis. Under the Rehabilitation Act, the Court does not even begin to look at the appropriateness of a private school placement unless it concludes that the public school district has failed to provide an appropriate education. *See Ridgewood*, 172 F.3d at 248. Thus, Dr. Berberian's testimony concerning the merits of the GMS program does not advance plaintiffs' cause.

### C. SUMMARY

For the reasons stated in this section, the Court finds that each of the District's proposed accommodations that plaintiffs challenge in this case is appropriate. Upon a review of the record, the Court concludes that the District's nineteen-accommodation Section 504 Service Agreement, as amended by the Hearing Officer's decision, provides a holistic approach to accommodating Molly's disabilities. In short, the District has shown that its plan

---

**7.** In connection with this argument, the record discloses that Dr. Berberian has never visited Belmont Hills Elementary School, the school where the District planned to place Molly. R. at 214.

provides the "significant learning" and confers the "meaningful benefit" embodied in the Rehabilitation Act's free appropriate public education requirement. Accordingly, plaintiffs are not entitled to reimbursement of the tuition they paid to GMS.

Because the Court concludes that the District has met its burden of demonstrating the appropriateness of its Section 504 Service Agreement, the Court does not consider the District's additional arguments that GMS provided an inappropriate education, that the equities of the case favor the District, and that GMS's educational program violates the Rehabilitation Act.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motion for Summary Judgment on the Administrative Record Below, and grants Defendant's Cross Motion for Summary Judgment. As a result, the Court also denies plaintiffs' requests for attorney's fees and independent evaluation fees.

An appropriate Order follows.

### ORDER

**AND NOW,** this 2nd day of April, 2002, upon consideration of Plaintiffs' Motion for Summary Judgment on the Administrative Record Below (Document No. 7, filed September 18, 2001), Defendant's Response to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment (Document No. 8, filed September 28, 2001), and the administrative record, for the reasons stated in the foregoing Memorandum, **IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment on the Administrative Record Below is **DENIED;** Defendant's Cross Motion for Summary Judgment is **GRANTED;** and **JUDGMENT IS ENTERED** in **FAVOR** of defendant Lower Merion School District and **AGAINST** plaintiffs Molly L., by and through her natural parents and next friends, B.L. and M.L.

**IT IS FURTHER ORDERED** that plaintiffs' requests for attorney's fees and independent evaluation fees are **DENIED.**